IN THE UNITED STATE DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                          CR. NO. 2:23-cr-20191-SHL

EMMITT MARTIN, III,
TADARRIUS BEAN, DEMETRIUS
HALEY, DESMOND MILLS, JR.,
AND JUSTIN SMITH

    Defendants.

---

DEFENDANT, JUSTIN SMITH'S, SUPPLEMENTATION OF LEGAL AUTHORITY IN
SUPPORT OF MOTION(S) FOR NEW TRIAL (ECF NOS.: 660 and 863)

---

    COMES NOW, the Defendant, Justin Smith (hereinafter "Justin Smith") by and through counsel and files this his Supplementation of Legal Authority in Support of his earlier Motion(s) for New Trial (ECF Nos.: 660 and 863)[1] and in support of same would state as follows:

    1.    Situations similar to the case at hand are nearly impossible to find in federal case law which candidly speaks to the significance of the events that have occurred.

    2.    However, a very instructive case provides guidance and analysis applicable to the case at hand.

---

[1] Defendant, Justin Smith, is filing his Supplementation of Legal Authority in Support of his Motion(s) for New Trial under seal in following the Court's standing current order to do so. Defendant, Justin Smith, renews his objection to the sealing of the court record and would refer this Honorable Court to the case law cited in ECF No.: 863, and renews his Motion to Unseal the current pleadings.

3. The case of *United States v. Mitchell Antar, et. al.,* 53 F.3d 568 (3rd Cir. 1995) (cited with approval by the Sixth Circuit in the case of *In re Nat'l Prescription Opiate Litig.*, No. 19-3935, 2019 WL 7482137 (6th Cir. Oct. 10, 2019)) is attached hereto.

4. A brief summary of the *Antar* case involves a singular statement made by the trial judge after the trial was concluded at the defendants' sentencing hearing.

5. That statement was:

> My object in this case from day one has always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others. (*Antar* at 573)

6. The defendants in *Antar* argued on appeal that the comment reflected that a bias existed during the earlier trial. The Government, in *Antar,* as they have in the case at hand, argued that the statement was made after the trial and would therefore not necessarily reflect any unfairness on the part of the trial judge during the trial. The argument of the Government in the *Antar* case as well as the case at hand, was and is without any merit. The undersigned would suggest to this Honorable Court that the analysis of the *Antar* case, when applied to the facts at hand, require granting a new trial.

7. In *Antar*, a comment was made by the trial judge in open court. ***The comments made by the former trial judge in this case were made in a secret private meeting with the FBI, U.S. Marshals and U.S. attorneys***.

8. The statement made in *Antar* surrounded the compensation of the victims of the crimes that the defendants were convicted of. ***The comments made by the former trial judge in this case was an explicit accusation of illegal gang membership of not only one or more of the defendants on trial, but also the entire Memphis Police Department***.

9. The statement made in *Antar* dealt with the actual case which had been tried and was stated in open court during sentencing. ***The comments made by the former trial judge in this case had nothing to do with the facts presented in the underlying trial, but were, in effect, a demand on the part of the federal trial judge for the federal law enforcement agencies to investigate the at-trial defendants who he was prepared to sentence***.

10. In *Antar,* defense counsel was present when the comment was made. ***In the case at hand, defense counsel would not have even known of the comments had the U.S. Attorney's Office not disclosed them***.

11. In *Antar,* there was a question of whether or not the basis for the court's comment was based upon "extrajudicial" factors. ***In the case at hand, it cannot be clearer that whatever conclusions the trial judge had formed, the suspicions stated could have only been formed by "extrajudicial" facts, and when reassured by the federal law enforcement officers present in the meeting that there was no evidence of gang membership, the trial judge would not recant***. In discovery that has been provided in this case subsequent to the verdict, the federal government admitted that there was no evidence of any gang affiliation of any of the defendants. A clearer case of "extrajudicial" facts or suspicions could not be had.

12. In determining whether or not the trial judge should have recused, and when later forced to recuse, whether or not justice requires a new trial, the standard is an objective standard not a subjective standard

13. These issues surrounding the appropriate standard (objective vs. subjective) have been briefed fully by the three (3) at trial defendants and will not be repeated here. The purpose of this supplementation is to suggest to this Honorable Court that the analysis of the *Antar* case,

3

as well as the U.S. Supreme Court authority relied upon by the *Antar* appeals court, supports a new trial being granted at the District Court level to correct the appearance of an injustice.

14. "[T]he public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who <u>appears</u> to be tainted," requires that "justice must satisfy the appearance of justice." *In re Asbestos Litig.*, 977 F.2d 764, 776 (3rd Cir.1992). "If a reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality under the applicable standard, then the judge must recuse." *In re Larson*, 43 F.3d 410, 415 (8th Cir. 1994)(quoting *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101, 1111, (5th Cir.), cert. denied, 449 U.S. 820, 101 S. Ct. 78, 66 L. Ed. 2d 22 (1980)).

## CONCLUSION

Applying the logic and legal precedent contained in *Antar* and its relied upon Supreme Court case law, requires for the appearance of justice, granting a new trial now versus an appeal.

Respectfully submitted,

<u>S/Martin Zummach</u>
Martin Zummach (#16352)
Attorney for Justin Smith
2889 Chattering Lane
Southaven, MS 38672
901-482-5909

Certificate of Service

The undersigned certifies that on the 13th day of August, 2025, a copy of the foregoing document was electronically filed with court clerk using the ECF System, and that upon filing, a copy will be sent via the Court's ECF System to all registered parties in this case.

<u>S/Martin Zummach</u>

**53 F.3d 568 (1995)**

**UNITED STATES of America**

v.

**Mitchell ANTAR, Appellant in 94-5228.**

**UNITED STATES of America**

v.

**Eddie ANTAR, Appellant in 94-5230.**

Nos. 94-5228 and 94-5230.

**United States Court of Appeals, Third Circuit.**

Argued March 2, 1995.

Decided April 12, 1995.

570  *569 *570 Gerald B. Lefcourt (argued), Joshua L. Dratel, John P. Monahan, III, John R. Ford, Lefcourt & Dratel, New York City, for appellant Mitchell Antar.

John J. Barry (argued), Adam N. Saravay, Barry & McMoran, P.C., Newark, NJ, for appellant Eddie Antar.

Faith S. Hochberg, U.S. Atty., Paul A. Weissman (argued), Victor Ashrafi, Asst. U.S. Attys., Newark, NJ, for appellee.

BEFORE: GREENBERG, NYGAARD, and McKEE, Circuit Judges.

GREENBERG, Circuit Judge.

The final judgments of sentence and conviction from which the defendants appealed marked the culmination of a decades-long rise and fall of an electronics retail chain called Crazy Eddie and the family that ran the company. When all was said and done, the saga involved: a New York-based chain which achieved enormous success over the past few decades in large part due to the company's aggressive advertising; an alleged behind the scenes sophisticated family-run conspiracy to operate Crazy Eddie in an unlawful manner, which allegedly netted the defendants millions of dollars; a series of rancorous intrafamily disputes — both business and personal — which wound up, tragically, in an *in camera* conference during the criminal trial centering around whether a defendant's presence at his daughter's funeral would be helpful or hurtful to the family; the flight of a defendant to Israel and his ultimate return to this country to stand trial; and a lengthy high-profile criminal case resulting in a prison term of more than ten years and a $121 million restitution order against the best-known defendant.

# I. Factual Background and Procedural History[1]

The Crazy Eddie, Inc. chain of consumer electronics stores began as a small operation in the 1970s and in a fairly short time grew into a major New York area consumer retail chain with stores in four states and with reported annual sales totalling over $300 million. Crazy Eddie began as a family-controlled operation with Eddie Antar as the key figure. At the relevant times, Eddie[2] was the company's president and chairman of the board, though in December 1986, he resigned as president. Eddie's younger brother Mitchell Antar worked for many years at Crazy Eddie and then was appointed vice-president in charge of purchasing and became a member of the board of directors in May 1984. Mitchell subsequently became one of three members of Crazy Eddie's "Office of the President." On June 5, 1987, Mitchell resigned from all his positions at the company, but did not divest himself of Crazy Eddie stock.

On September 13, 1984, Crazy Eddie conducted an initial public offering ("IPO") of its stock. Originally sold at $8 per share, by 1986 the stock was trading at over $75 per share. So by all appearances, investors in Crazy Eddie had discovered a gold mine. However, according to the indictment ultimately returned, behind the scenes the defendants were manipulating the books and falsifying financial statements which rendered the optimistic appearances misleading. The scheme allegedly
571    began between 1980 and 1983, when Eddie and other defendants engaged in an unlawful practice called "cash *571

skimming." Cash skimming involves keeping certain cash receipts off the books so that it can be put to tax-free personal use. The defendants soon decided to curtail the cash-skimming in preparation for the IPO, because suddenly putting more profits on the books would cause potential investors to believe that the company experienced an exponential growth in earnings. In reality, though, by manipulating the profits entered on the books, the defendants artificially fostered a false appearance of growth. These activities resulted in the filing of a false financial statement with the Securities and Exchange Commission.

The indictment alleges that during the next few years, Eddie directed employees to inflate year-end inventory figures, and to falsify the company's books to improve the financial information it would report to the SEC. This conduct enabled the defendants to conduct successful second and third public offerings of stock. The various defendants allegedly committed other, similar fraudulent acts during this time period. By the end of 1986, the company had begun to lose money, but, the government alleges, the defendants still continued to fabricate Crazy Eddie's financial statements. In May 1987, Eddie attempted, through the initiation of a tender offer, to buy back the company's shares and take it private. In June 1987, Elias Zinn of Entertainment Marketing, Inc. launched a competing tender offer. Eddie's tender offer failed, and while Zinn withdrew his competing offer, he also began a proxy fight in cooperation with the Oppenheimer-Palmieri Fund to take over the board. Their proxy fight became successful on November 6, 1987. After taking control, Zinn and the Fund took a physical count of the company's inventory, only to find that inventory valued on its books at about $45 million was missing.

In August 1987, the SEC began an investigation into the alleged fraud at Crazy Eddie. The indictment alleges that upon learning of this, Eddie and others attempted to destroy damaging records to conceal the extent of their fraud. Ultimately, though, on September 6, 1989, the SEC filed a civil action in the United States District Court for the District of New Jersey, alleging that Eddie and several others on a number of occasions had falsified Crazy Eddie's financial statements. Upon motion by the SEC, the district court preliminarily enjoined Eddie from making any false statements in connection with securities filings. Additionally, the court ordered that:

> [D]efendant Eddie Antar shall transfer all assets, funds or other property representing or derived from the $43,989,640.38 transferred to Bank Leumi Israel on or about February 17, 1987, or from the funds in the aggregate amount of $8,367,325.25 transferred to Bank Leumi Israel on or about November 27, 1987, December 3, 1987, December 15, 1987, and January 21, 1987,[3] presently held in foreign locations in the name of Eddie Antar, for his benefit, under his control or over which he exercises actual investment or other authority, to be held and invested in accordance with such instructions as the Court may issue upon notice to the parties.

*SEC v. Antar,* No. 89-3773, January 24, 1990 Order at app. 1063 (the repatriation order).[4] Eddie failed to comply with the order — asserting his Fifth Amendment privilege against self-incrimination — even after the court granted him extensions of time to comply. Finally the court issued an order to show cause why he should not be held in contempt. On February 9, 1990, the district court entered an order finding that "Eddie Antar did not comply with the Court's order for the transfer of assets" and that his "failure to comply with the Court's order is willful and contumacious." App. 1065. Thus, the court held him in contempt, and ordered him incarcerated until he complied with the repatriation order. Eddie appeared before a different district judge in order to purge the contempt, and at that hearing agreed to appear before the district court on February 27, 1990. He did not appear on that date, *572 and, as it subsequently became known, he fled the country.

572

On April 6, 1990, the court ordered that Eddie's answer to the SEC's complaint be stricken and four days later it entered an order of default against him. In response to a motion by the SEC, the court on June 29, 1990 determined that "(1) Eddie Antar made illegal profits of $52,519,548 from the sale of the stock of Crazy Eddie, Inc. and is obligated to disgorge that amount; and (2) Eddie Antar is liable for prejudgment interest in the amount of $20,976,884." App. 1051. The SEC subsequently moved for final judgment, and on July 6, 1990, the court entered final judgment against him. In that order, the court, among other things, ordered him to "pay disgorgement in the amount of $52,519,548 (which amount constitutes Eddie Antar's illegal profits from the sale of the stock of Crazy Eddie, Inc. in violation of the federal securities laws) to ... the trustee/receiver appointed by this court, to be distributed pursuant to a plan of distribution proposed by the [SEC] and approved by the court." App. 1055-56.

On June 11, 1992, a federal grand jury returned a multi-count indictment against Eddie Antar, Mitchell Antar, Allen Antar and Eddie Gindi. Count 1 of a superseding indictment charged all the defendants with conspiring to conduct or participate in the affairs of Crazy Eddie through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d), *i.e.,* RICO conspiracy, and alleged as predicate acts securities fraud and mail fraud violations resulting from the falsification of Crazy Eddie's books

and the artificial inflation of the market price of Crazy Eddie stock. Counts 2 through 4 charged all the defendants with causing false and misleading statements to be made in documents Crazy Eddie filed with the SEC, in violation of 15 U.S.C. §§ 78m and 78ff(a). Count 5 charged the defendants with mail fraud, in violation of 18 U.S.C. § 1341, for mailing a false SEC filing to a shareholder. Counts 6 through 16 charged Eddie with substantive securities fraud arising from the sale of stock, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5. Counts 17 and 18 charged Mitchell with similar substantive securities fraud violations. Count 19 charged all the defendants with conspiring to commit securities fraud and mail fraud, in violation of 18 U.S.C. § 371.

When the indictment was filed, Eddie's whereabouts were unknown, but in June 1992, he was arrested in Israel. After several proceedings in that country, Eddie waived extradition, and voluntarily returned to this country to stand trial.

All four defendants initially pleaded not guilty, but Gindi's case was severed and he became a government witness at trial. The case against Eddie, Mitchell and Allen Antar began on June 15, 1993. After 19 days of trial, the case was submitted to the jury on July 15, 1993. Five days later the jury returned its verdict. It convicted Eddie on all counts against him and convicted Mitchell on counts 1 through 5 and 19, but acquitted him on counts 17 and 18. The jury acquitted Allen on all counts.

On March 22 and 23, 1994, the district court held a sentencing hearing. On April 29, it sentenced Eddie to 151 months in prison and ordered him to pay $121 million in restitution. The court sentenced Mitchell to 51 months in prison and ordered him to pay $3 million in restitution. Eddie and Mitchell timely filed notices of appeal, challenging both their convictions and their sentences. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

## II. Analysis

### A. Duty to Recuse

The appellants argue that the district court should have disqualified itself *sua sponte* pursuant to 28 U.S.C. § 455.[5] In response, the government, relying on the failure of the appellants to make a recusal motion in the district court, contends that the argument is untimely and that we should not consider it. However, our precedent clearly establishes that under this statutory provision, *573 which contains no explicit timeliness requirement, even when such motions are not made in the district court, we can exercise review over a district judge's failure to recuse. The standard of review does, though, change. Thus, "where no objection to the district court's failure to recuse was made at trial, a plain error standard of review applies." United States v. Dalfonso, 707 F.2d 757, 760 (3d Cir.1983) (citing United States v. Schreiber, 599 F.2d 534 (3d Cir.), *cert. denied,* 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979)). The plain error doctrine derives from Federal Rule of Criminal Procedure 52(b) which provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."[6]

573

When a party makes a recusal motion at trial, a district court's failure to recuse is reviewed for abuse of discretion. A conviction may be reversed under the plain error doctrine only when "[t]here [was] an `error' that is `plain' and that `affect[s] substantial rights.'" United States v. Olano, ___ U.S. ___, ___, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993) (first alteration added). "Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the Court of Appeals and the court should not exercise that discretion unless the error `"seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."'" *Id.* (citations omitted) (alteration in original).[7]

The appellants' allegations of bias derive in large part from a colloquy that occurred between the United States Attorney and the district court at the sentencing hearing, when the district court was considering the amount of restitution to award. We quote the passage at length, with all its surrounding context:

> MR. CHERTOFF[8]: Finally, your Honor, in connection with the Court's observation about the fact that the public is to be the beneficiary of this, I'd like to suggest to the Court that in ordering restitution the Court define the appropriate class of victims to receive the restitution, which I think would be those who on a net — those investors, other than co-conspirators of the offense or the defendants, themselves, who on a net basis

lost money trading in the securities of Crazy Eddie before June 2nd, 1988. And to the extent there is money left over, that any third parties who had to make compensation to those victims be themselves compensated.

THE COURT: Because that is a more complex issue, I'd like to get the input from the SEC and experts. I will defer to another day the disposition of the moneys so far as the public is concerned.

My Trustee-Receiver will hold it. Then I would anticipate the U.S. Attorney's office, in connection with the SEC, will make appropriate applications on notice to the defendant and the defendant's counsel so that we can get everyone's total input. *My object in this case from day one has always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others.* We will work the best possible formula we can to be as fair as possible to *574 the public. If we can get the 120 million back, we would have accomplished a great deal in this case.

574

Tr. Sentencing Hearing 407-08 at app. 1008 (emphasis added). Of course, the italicized language is the crucial passage. Appellants argue that the statement reflects "an appearance that the district court had prejudged [their] guilt and that a number of his rulings were skewed by his determination to enforce his Repatriation Order in the civil case and to `get back' the money from Mr. Antar." Eddie br. at 10. Thus, in their view, the judge's sentencing comments shed light on the reasons behind several of his rulings, including his computation of their prison terms and the amount of restitution. Lurking in this series of arguments is the contention that the district court's "goal" during the trial simply was improper and that that in itself mandated the judge's disqualification. In response, the government relies on the fact that "[b]y that time, however, Antar had of course been found guilty," and that therefore the statement "did not indicate that the court had been unfair to Antar, or even that it had believed he personally was guilty `from day one.'" Br. at 66.

The pertinent recusal statute, 28 U.S.C. § 455(a), provides that a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." See Liteky v. United States, ___ U.S. ___, ___, 114 S.Ct. 1147, 1150, 127 L.Ed.2d 474 (1994); United States v. Bertoli, 40 F.3d 1384, 1412 (3d Cir.1994). As the Supreme Court recently made clear, generally beliefs or opinions which merit recusal must involve an extrajudicial factor. Liteky, ___ U.S. at ___, 114 S.Ct. at 1157. For example, if a judge has acquired a dislike of a litigant because of events occurring outside of the courtroom, a duty to recuse might ensue. However, although such situations are not common, "opinions formed during a judicial proceeding may in certain instances give rise to a duty to recuse." Bertoli, 40 F.3d at 1412. As the Liteky Court pointed out, if during "a lengthy trial ... the presiding judge for the first time learns of an obscure religious sect, and acquires a passionate hatred for all its adherents," the fact that the beliefs arose through a judicial proceeding does not negate the duty to recuse. Id. at ___, 114 S.Ct. at 1154; see also Bertoli, 40 F.3d at 1412.

Biases stemming from facts gleaned during judicial proceedings themselves must be particularly strong in order to merit recusal. "A favorable or unfavorable predisposition can ... deserve to be characterized as `bias' or `prejudice' [when] even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." Liteky, ___ U.S. at ___, 114 S.Ct. at 1155. In such situations, then, the court's actions must "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Id. at ___, 114 S.Ct. at 1157. By the statutory language itself, though, section 455(a) mandates an objective rather than a subjective inquiry. See Bertoli, 40 F.3d at 1412 ("The judge does not have to be *subjectively* biased or prejudiced, so long as he *appears* to be so.") (quoting Liteky, ___ U.S. at ___, 114 S.Ct. at 1156 n. 2) (emphasis in original); Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 162 (3d Cir.1993) ("[T]he public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted", requires that "justice must satisfy the appearance of justice.") (quoting In re Asbestos Litig., 977 F.2d 764, 776 (3d Cir.1992)); In re Int'l Business Mach. Corp., 45 F.3d 641, 643 (2d Cir.1995). Therefore, if a "reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality" under the applicable standard, then the judge must recuse. In re Larson, 43 F.3d 410, 415 (8th Cir.1994) (quoting Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1111 (5th Cir.), cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980)).

575

Post-*Liteky* cases involving allegations of bias derived from judicial proceedings have construed the exception to the extrajudicial source requirement narrowly. In United States v. Young, 45 F.3d 1405 (10th Cir.1995), for example, the Court of Appeals for the Tenth Circuit reviewed the following colloquy between the trial court and the defense attorney *575 regarding the scheduling of a trial date. The colloquy occurred after the judge had refused to accept the defendant's guilty plea (upon finding that she had not sufficiently admitted to criminal wrongdoing) and after the government's attorney informed the judge that a plea still was expected:

> MR. JAPHA[9]: Well, your Honor.... I'm wondering then if we could start that trial, then, on Monday, May 17, because I have a conflict in the middle of the week May 26th and 27th.
>
> THE COURT: No, because I've got the Sarmiento crowd. No. That's the week I'm in Washington for the federal judges' association. We've got a union meeting.
>
> MR. JAPHA: What about the week before?
>
> COURTROOM DEPUTY: He's in trial.
>
> THE COURT: That's when we're going to be in trial on this Sarmiento case for two weeks. That's the six weeks' case that we're going to do in two. So we're going to have to do your lady on the 24th unless she sees the light.
>
> MR. JAPHA: I hear you. I'll just say, the difficulty I have is, on Wednesday the 26th and 27th —
>
> THE COURT: And bear in mind this: that the obvious thing that's going to happen to Ms. Young is that she's going to get convicted, and then they're going to sprinkle her and bless her with immunity, and then she's going to get to testify. And then she's going to pull the same act on me again, and then she's going to the county jail for at least 30 if not 60 or 90 days for contempt. And we'll do that as often as necessary until she starts talking.

*Id.* at 1414.

In *Young,* the court of appeals found that the district court was not obligated to recuse. As the court pointed out: "The comments reflected the judge's belief that Ms. Young was likely to be convicted if she went to trial. Such an opinion of what the jury was likely to find does not show that the judge could not possibly render fair judgment. Nothing in the remark indicates that the judge was unable or unwilling to carry out his responsibilities impartially." *Id.* at 1415-16. In fact, the judge only was indicating what he would have done had certain contingencies occurred. Nothing he said showed that he would be partial if those contingencies did not occur. Moreover, the judge made the statements after the defendant's first attempt to plead guilty. Therefore "[t]he setting in which [the statement] was made indicates that the judge intended to convey a message to [the defendant] that if she wanted to enter a guilty plea she would have to admit knowledge sufficient to constitute an offense under the statute." *Id.* at 1416.

In a recent case from the Court of Appeals for the Seventh Circuit, a bankruptcy judge summarily denied defendants' motion to dismiss the complaint, summarily granted plaintiff's motion to amend the complaint, and stated during a hearing that "`any predisposition this court has in this matter is a result of things that have taken place in this very courtroom,' and asserted that `I am perfectly entitled to conclusions and judgments based on what takes place in the courtroom.'" *In the Matter of Huntington Commons Assocs.,* 21 F.3d 157, 158 (7th Cir.1994). The court of appeals ruled that the judge's impatience with and admonishments to the defendant, combined with adverse judicial rulings and a vague reference to a possible "predisposition" were not "remotely sufficient evidence of the required `deep-seated and unequivocal antagonism that would render fair judgment impossible.'" *Id.* at 159 (quoting *Liteky,* ___ U.S. at ___, 114 S.Ct. at 1157). There was nothing to indicate that the judge's rulings were based on improper considerations.

This case is different from those cases and also from nearly all the reported recusal cases we have come across. This is not a case where the district judge is accused of being biased in a personal way against a litigant. Nor is this a case where a judge's rulings are so indefensible that combined with particular comments they arguably demonstrate partiality towards or against a party. It is not even a case where, as in *Huntington Commons,* it is argued that the judge's previous experience with the case *576 may have left him disdainful of one party's position. Rather, this is a case where the district judge, in stark, plain and unambiguous language, told the parties that his goal in the criminal case, from the beginning, was something other than what it should have been and, indeed, was improper. Of course, a trial judge in a criminal proceeding should ensure that a fair and orderly trial takes place in the courtroom. Here, however, the district court told the parties that his goal from the beginning of the criminal proceeding was to enforce a repatriation order and final judgment issued during a concurrent civil proceeding and give back the proceeds recovered to the public. It is difficult to imagine a starker example of when opinions formed during the course of judicial proceedings display a high degree of antagonism against a criminal defendant. After all, the best way to effectuate the district judge's goal would have been to ensure that the government got

576

as free a road as possible towards a conviction, which then would give the judge the requisite leverage to order a large amount of restitution. And it goes without saying that this is an improper role for a district judge during a criminal trial.

We reject the implications of the government's argument — that because the statement occurred after the trial, it cannot form the basis of an allegation of bias during the trial. Suppose, for instance, that at sentencing the district judge informs a defendant that throughout the trial his object had been to see the defendant behind bars. A reasonable observer in such a scenario would have serious reason to question whether prior rulings in the case were based on impartial considerations or on the judge's stated goal. The fact that the judge's motivation came to light only after the conclusion of the trial would be of no moment. Furthermore, it does not matter that the judge's rulings in the case may have been otherwise defensible, for we are concerned with the appearance of partiality.

Moreover, we consider what the situation would have been if, instead of revealing his goal at the end of the trial, the judge made the same statement at the beginning of the trial. In that scenario, the judge would have said: "My goal in this case will be to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others." There would be very little question that such a statement would give rise to a duty to recuse. The fortuitous fact that the judge made his goal clear at the end rather than at the beginning of trial is of no principled consequence.

We nevertheless consider whether we should read the judge's words as meaning something other than what they say on their face, particularly where, as here, the judge is a distinguished and respected jurist whose career has demonstrated anything but unfairness to litigants. Thus, the government at oral argument before us contended that the district judge really was referring to the civil SEC proceeding rather than the criminal proceeding. Or, we could imagine that the district judge made an unfortunate and isolated statement — a stray remark — after the defendants had been convicted and during a lengthy and partly spontaneous colloquy during a sentencing hearing. In this latter interpretation, the judge would be pointing out his recognition that from the beginning of the trial it had been clear that the public had been defrauded and that after conviction it became clear that it was the defendants who had perpetrated the fraud.

In considering whether the remark should be so read, we recognize that the matters before the district court were both lengthy and complicated. Moreover, we are conscious of the constant pressures exerted on the district court in a high profile case such as this and are aware that we are focusing on one sentence out of volumes of transcripts.

But in determining whether a judge had the duty to disqualify him or herself, our focus must be on the reaction of the reasonable observer. If there is an appearance of partiality, that ends the matter. _Haines v. Liggett Group Inc.,_ 975 F.2d 81, 98 (3d Cir.1992); _Lewis v. Curtis,_ 671 F.2d 779, 789 (3d Cir.) ("Impartiality and the appearance of impartiality in a judicial officer are the sine qua non of the American legal system."), _cert. denied,_ 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). That being the case, we must be careful not to rewrite what *577 the judge said and render unreasonable the clearest and most obvious reading of the language. After all, we are reviewing a record, and when all is said and done, the transcript of the proceeding speaks for itself. If a reasonable observer is entitled to take the judge at his word — and certainly he or she is so entitled — we think that after reading the judge's remarks at sentencing, that reasonable observer would think that the judge, as he indicated, had the goal in the trial of recovering substantial funds from the appellants, a goal which their convictions would help him reach.

577

Our conclusion is further compelled by the particular circumstances of the case, combined with certain of the judge's comments and decisions during the trial, which when read in light of the remark at sentencing, make a reasonable observer even more concerned that the judge had an improper goal.

For one thing, hearings in the civil SEC case and the criminal proceeding routinely were held one after another on the same day. On January 11, 1993, the district court heard arguments on both Eddie Antar's arraignment in the criminal case and the SEC's application for an order to show cause why Eddie should not be incarcerated until he purged himself of civil contempt by repatriating the $52 million that was the subject of the judge's prior final judgment in the civil case. _See_ app. 160-73. As Eddie's trial counsel put it, the civil case and the criminal case are "clearly interrelated." App. 167. On January 14, 1993, the district court held a scheduling and discovery hearing in the criminal case, and heard arguments by the SEC on the order to show cause, which became returnable on February 2, 1993. App. 176-92. On February 2, the court both heard testimony on the SEC's application and heard arguments and ruled on the government's application to detain Eddie without bail in the criminal proceeding. App. 193-269. Thus, it is certainly believable, in light of the sentencing colloquy, that the judge's frustration at Eddie's refusal to obey the repatriation order seeped into his orders in the criminal case.

The repatriation order also figured heavily during the arguments on the bail application, as one point of contention centered around whether the $52 million could be considered Eddie's assets for that purpose:

> THE COURT: What about somewhat between 50 and $100 million that lay out there some place? What if Mr. Antar were to be put in a situation, escape, go run and through some way get his hands on some 50 or $100 million that might be available to him in other places?....
>
> MR. ARSENEAULT:[10] Your Honor, I have two responses. I recognize the need for the Court to engage in hypothetical hyperboles in weighing this application. But in terms of the reality, the reality, your Honor, is the assets of Mr. Antar abroad are frozen. They have been frozen since at least June of this year.... So there is no realistic possibility that those assets are available for anybody.
>
> * * * * * *
>
> THE COURT: Is he willing to sign the papers necessary to have those funds brought under the control of this Court or with the trustee/receiver to abide whatever events may occur in either this criminal case or the civil case?
>
> MR. ARSENEAULT: It may be, your Honor, under certain circumstances. But independent of that issue, your Honor, I don't believe that issue is tied to the bail application. That money is unattainable. It is where it is. It can't be touched. It can't be moved.
>
> The government has stood up time and time again before your Honor in this courtroom and said those assets have nothing to do with bail. They have no impact on bail. They can't be posted as bail.
>
> THE COURT: Simpson from the SEC says `they belong to me.' He takes the position they belong to him as the judgment creditor. Whether they do or do not, Mr. Arseneault, is not an issue I'm addressing. At least, titulary they're in the name of Mr. Antar or one of his pseudonames [sic].

578 *578 What I'm saying is what I think is one of the things that is lacking in your bail application is the agreement by Mr. Antar to unequivocally throw before this Court all of those assets and say: Judge, they will abide the events, whether they be criminal or civil, and let those moneys go.

> If I'm right — and I have no reason, from the outset, to indicate in a criminal context that he's guilty or not guilty. I express no opinion at all. But abide the events. And, Judge — it seems to me he should say, Judge, if I'm right, I'll get them all back. These are fake charges. Everything is wrong. I'm an innocent man. I'm as innocent as the chorus of confidence people say I am.
>
> Why doesn't he throw it all out, give it to the good old judge here and say: Judge, you hold it pending the final outcome of the matter and that that is security for the fact that I'm not going to flee. And, by the way, Judge, I will also get on the stand and under oath disclose to you each and every asset that I have, and I will swear under oath to you, Judge, that I don't have another pittance any place else, either directly or indirectly controlled by me?
>
> Wouldn't that be a nice, pure way to come before me? Then, you know, it might start triggering the mind a little bit here.

App. 202-04.

There is no question that, as the *Liteky* Court put it, "[d]isinterestedness does not mean child-like innocence." *Liteky, ___ U.S. at ___, 114 S.Ct. at 1155.* And, "not subject to deprecatory characterization as `bias' or `prejudice' are opinions held by judges as a result of what they learned in earlier proceedings [as i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Id.* Thus, it certainly would be understandable if the district judge, based on his experience from the civil proceeding, was "exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person." *Id.* But, when a judge has formed opinions during a civil case, he or she certainly must be careful not to have those beliefs influence his or her *goal* in the criminal case. During the transcripts quoted above, the district court quite properly inquired into Eddie's access to foreign assets. But, read in light of the judge's statement at the end of the case, a reasonable person reading the transcript

could not help but wonder if the judge was using the bail hearing to try to enforce the repatriation order. The judge repeatedly connected the two proceedings in his questions to counsel, and even the Assistant United States Attorney conceded that "Mr. Arseneault and I can agree on one thing. And that is that I agree it is not the issue whether or not the money frozen abroad is returned for purposes of this proceeding. The issue is whether there is any condition or combination of conditions which will reasonably assure Mr. Antar's appearance." App. 211.

The repatriation order again came up during the trial when Eddie's daughter died and his attorney requested the court to allow him to sit shivah[11] for a seven-day period of mourning:

> MR. ARSENEAULT: Without being redundant ... I ask your Honor to remember, we're more than willing to post whatever surety if the issue is an issue of flight.
>
> I've been told before it is not a flight issue; that the issue initially identified was an issue of the Marshals and a brouhaha because of the family split. We now know, thanks to Mr. Dreyfuss' phone call, that is not an issue.
>
> THE COURT: The surety part doesn't make sense. There is $60 million laying out there. I'm not going to divorce myself from my knowledge.
>
> RABBI GREENWALD: Your Honor —
>
> THE COURT: Let me finish. Let's not get on that subject.

579 There is $60 million out there that I'm aware of that your client has refused to *579 sign over to the trustee. So we're not talking about surety.

Come on. Does he want to sign the 60 million over? App. 518-19. Again, it was perfectly appropriate for the district judge to be concerned about the risk of flight should Eddie be released from jail for seven days, and in reaching his conclusions to rely on his knowledge of the foreign accounts. But a reasonable person reading the transcript in light of the judge's statement during the sentencing could not help but wonder if the district judge was seeking to achieve his stated goal of enforcing the repatriation order.

In other words, it cannot be said fairly that in holding that the judge should have disqualified himself we are pulling an isolated statement out of context. To the contrary, a reasonable person reading the transcripts would have found other reasons to believe that the judge in fact was expressing his intention. Being familiar with the judge and his work, we are not prepared to say the district judge actually was biased. But we are constrained to say that a reasonable person could think that the judge's goal during the criminal proceeding — and the reason behind some of the rulings — was to enforce orders he issued in a parallel civil case. Because such a goal was entirely improper in a criminal case, we believe that the judge should *sua sponte* have recused himself. Inasmuch as the failure to recuse in this context has the appearance of affecting the fairness and integrity of the trial, and because it "seriously affect[s] the ... public reputation of [the] judicial proceeding[]", Olano, ___ U.S. at ___, 113 S.Ct. at 1779, we are constrained to exercise our discretion under Fed.R.Crim.P. 52(b) and reverse the convictions and remand the matters for new trials before a different district judge.

We realize, of course, that the appearance of a lack of impartiality principally concerned Eddie. But we cannot distinguish reasonably between Eddie and Mitchell in this respect, as they were charged with offenses arising from the same circumstances. Furthermore, the judge indicated that he intended to recover what "this defendant," meaning Eddie, and "others" had taken by fraudulent activities. Clearly, Mitchell was included among the "others." Therefore, both appellants are entitled to a new trial.

## B. Mitchell's Withdrawal

Because we are reversing both the convictions and sentences, we need not address most of the other issues that the appellants raise as they at most could lead to new trials. However, Mitchell argues that since he resigned from the enterprise prior to the commencement of the five-year statute of limitations, both conspiracy and substantive liability for post-resignation acts cannot be attributed to him based on his alleged membership in the conspiracy. Because this is an argument of law which if successful would require a judgment of acquittal, we address it on the merits.

Mitchell's arguments derive from the following undisputed facts: For several years prior to June 5, 1987, he served as an officer of Crazy Eddie, Inc., as a vice-president in charge of purchasing, a member of the board of directors, and one of three members of an office of the president. During this time, Mitchell allegedly participated with Eddie and others in the securities fraud that underlay the RICO indictments. On June 5, 1987, Mitchell resigned from the board. In a statement issued to the board, he gave the following reasons for his resignation:

> Over the past months, my brother Eddie's relationship with my family has been acrimonious and has resulted in a series of very disturbing developments involving the Company. My father, brother Alan and Eddie's mother-in-law have been fired and certain key employees who are particularly important to the marketing area — my end of the business, have been forced to resign or have been fired summarily.
>
> Although part of the three member Office of the President, I have not been consulted on major decisions, among them the firing of personnel ..., executive compensation and the like. Under these conditions, I find it impossible to continue as Director and Executive Officer of the Company. Therefore, effective immediately, I *580 am resigning as an Executive Officer of Crazy Eddie and as a Director.

580

June 5, 1987 Statement of Mitchell Antar at JA 254. Mitchell continued to own stock in the company, selling 30,000 shares on August 21, 1987, 30,000 shares on August 28, 1987, and 1,000 shares on September 23, 1987. *See* JA 290.

Mitchell contends that to the extent he participated in an unlawful conspiracy, his participation ceased on June 5, 1987, prior to the commencement of the five-year statute of limitations. Accordingly, he argues that the conspiracy charges should have been dismissed. JA 290. He further argues that to the extent the substantive counts depend on his participation in an unlawful conspiracy, they should be dismissed as well.

Mitchell's argument regarding the charged RICO conspiracy begins with the recent Supreme Court case of *Reves v. Ernst & Young,* ___ U.S. ___, 113 S.Ct. 1163 (1993), which interpreted RICO, 18 U.S.C. § 1962(c). That section makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, through a pattern of racketeering activity." In *Reves,* the Supreme Court clarified the meaning of the language "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." Relying on the words "conduct" and "participate," the Court reasoned that "*some* part in directing the enterprise's affairs is required." *Id.* at ___, 113 S.Ct. at 1170 (emphasis added). Thus, the Court adopted the "operation or management" test previously followed by the Court of Appeals for the Eighth Circuit, and held that "one is not liable under [section 1962(c)] unless one has participated in the operation or management of the enterprise itself." *Id.* ___, 113 S.Ct. at 1172. While the Court did not limit the statute's reach to persons in upper management, it did emphasize that the person being sued must exercise some control over the enterprise.

In light of *Reves,* it seems fairly clear that Mitchell could not have been charged with violating section 1962(c) based on his acts after he resigned from Crazy Eddie. While he continued to own stock in the company, there is no evidence to indicate that he played any role in operating or managing the enterprise. But that does not necessarily mean that he is not chargeable for *conspiring* to violate section 1962(c).

RICO's conspiracy section, section 1962(d), makes it unlawful for any person to conspire to violate sections 1962(a), (b), or (c). Despite *Reves,* a number of courts have held that even if a person may not be held directly liable for violating section 1962(c), he or she still may be liable for conspiring to violate section 1962(c). In *United States v. Quintanilla,* 2 F.3d 1469 (7th Cir.1993), for example, Gutierrez participated in a scheme to defraud a corporation of money by submitting false funding proposals to a corporate program designed to fund various social events. It appears from the court of appeals' discussion that Gutierrez, while assisting her boyfriend in submitting the false proposals, did not operate or manage the enterprise in any way, and therefore did not violate section 1962(c). Nonetheless, she was charged with and was convicted of conspiring to violate section 1962(c) pursuant to section 1962(d). On appeal, Gutierrez argued that *Reves* barred her conviction under section 1962(d). The court of appeals disagreed, reasoning as follows:

> The defendant confuses her conviction for conspiracy (an agreement to commit a crime) with a conviction for a substantive crime. She was charged in Count One of the superseding indictment with violating 18 U.S.C. § 1962(d) .... Section 1962(d), unlike § 1962(c), is not a substantive RICO offense; rather, § 1962(d) merely makes it illegal to conspire to violate any of the preceding sections of the statute.

*Quintanilla,* 2 F.3d at 1484. Thus, "[o]ne violates § 1962(d) ... when she agrees to violate a substantive RICO offense, regardless of whether she personally agreed to commit the predicate crimes or actually participated in the commission of those crimes." *Id.* Other courts have used similar reasoning in upholding section 1962(d) liability when section 1962(c) liability proved unavailing. *See, e.g.,* United States v. Viola, 35 F.3d *581 37, 43 (2d Cir.1994) (A "RICO conspiracy charge is proven if the defendant `embraced the objective of the alleged conspiracy,' and agreed to commit two predicate acts in furtherance thereof" irrespective of the fact that the defendant "did not participate in the operation or management of the enterprise.") (citing United States v. Neapolitan, 791 F.2d 489, 499 (7th Cir.), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986)), *cert. denied,* ___ U.S. ___, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995); Jones v. Meridian Towers Apartments, Inc., 816 F.Supp. 762, 773 (D.D.C.1993) ("To hold that under § 1962(d) a plaintiff must show that an alleged coconspirator was capable of violating the substantive offense under § 1962(c), that is, that he participated to the extent required by *Reves,* `would add an element to RICO conspiracy that Congress did not direct.'") (quoting United States v. Pryba, 900 F.2d 748, 760 (4th Cir.), *cert. denied,* 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990)); Fidelity Fed. Sav. & Loan Ass'n v. Felicetti, 830 F.Supp. 257, 261 (E.D.Pa.1993) ("[L]iability under § 1962(d) turns not on whether a defendant personally commits the predicate acts, but rather that the defendant agrees only to the commission of the predicate acts.").

Nonetheless, Mitchell's argument that courts risk eviscerating *Reves* by blanketly approving conspiracy convictions when substantive convictions under section 1962(c) are unavailable has some merit. There is no question that a broad reading of the cases cited above would be problematic. As one commentator has explained, "[i]f Congress' restriction of section 1962(c) liability to those who operate or manage the enterprise can be avoided simply by alleging that a defendant aided and abetted or conspired with someone who operated or managed the enterprise, then *Reves* would be rendered almost nugatory." David B. Smith & Terrance G. Reed, *Civil RICO,* § 5.04 at 5-39 (1994). But we believe that a distinction can be drawn between, on the one hand, conspiring *to* operate or manage an enterprise, and, on the other, conspiring *with* someone who is operating or managing the enterprise. Liability under section 1962(d) would be permissible under the first scenario, but, without more, not under the second. This is because in the former situation, the defendant is conspiring to do something for which, if the act was completed successfully, he or she would be liable under section 1962(c). But in the latter scenario, the defendant is not conspiring to do something for which he or she could be held liable under the substantive clause of the statute.[12] Therefore, liability should not attach. The distinction we draw derives directly from 18 U.S.C. § 1962(d) which provides that it is "unlawful for any person *to conspire to violate*" sections 1962(a), (b), or (c). (Emphasis added.) Of course, under section 1962(d) a "person" is not limited to a person "employed by or associated with any enterprise" as is the case under section 1962(c).

This case falls into that former category, i.e., *a conspiracy to operate or manage an enterprise,* and therefore *Reves* and its concomitant policies do not conflict with the conspiracy convictions. This is not because, as the government argues, the defendant is confusing section 1962(c) liability with liability under section 1962(d). As detailed above, there are situations when section 1962(d) convictions would conflict with *Reves'* interpretation of section 1962(c). Rather, it is because here section 1962(d) liability is premised on Mitchell's membership in the conspiracy, and his performance at that time as an operator or manager of the enterprise. In determining whether Mitchell arguably was a member of the conspiracy, the jury could consider his pre-resignation acts. For instance, imagine a manager of an enterprise, engaged in racketeering activity, who then leaves the enterprise to start an accounting practice, and becomes the enterprise's auditor. If his resignation did not constitute withdrawal from the conspiracy, the statute of limitations never started running. Liability is premised on ordinary principles of conspiracy law, and has nothing to do with the *582 policies behind *Reves.* This is precisely that situation, and thus, the question is solely whether, having joined the conspiracy, and having committed overt acts in furtherance of the conspiracy, Mitchell can be held liable for the conspiracy based on acts committed by co-conspirators after his resignation. In other words, this is a withdrawal case, and *Reves* has nothing relevant to say on that point.

In this regard, section 1962(d) long has been interpreted against the backdrop of traditional conspiracy law and thus the same analysis applies both to the RICO and section 371 conspiracies. Under that body of law, there is no question that "the statute of limitations does not bar an action for RICO conspiracy against that individual if he or she continues as a coconspirator and another conspirator acted within the five year period." United States v. Gatto, 746 F.Supp. 432, 463 (D.N.J.1990) (citing United States v. Persico, 832 F.2d 705, 713 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988)). However, if a defendant properly and adequately terminates his or her involvement with the conspiracy, he or she no longer can be held responsible for acts of his or her co-conspirators and the statute of limitations begins to run in his behalf. *See* Gatto, 746 F.Supp. at 463 ("Where the conspiracy continues into the limitations period, an individual conspirator can commence the running of the statute of limitations as to him or her by affirmatively withdrawing from the conspiracy.").

The Supreme Court long ago set forth a rigorous standard for demonstrating withdrawal. In 1912 in *Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912), the Court explained as follows:

> Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act *to disavow or defeat the purpose* he is in no situation to claim the delay of the law. As the offense has not been terminated or accomplished, he is still offending. And, we think, consciously offending, offending as certainly ... as at the first moment of his confederation, and continuously through every moment of its existence.... Until he does withdraw there is conscious offending....

*Id.* at 369-70, 32 S.Ct. at 803 (emphasis added). Thus, we have held that "[m]ere cessation of activity in furtherance of an illegal conspiracy does not necessarily constitute withdrawal." *United States v. Steele,* 685 F.2d 793, 803 (3d Cir.1982), *cert. denied,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982). Rather, "[t]he defendant must present evidence of some affirmative act of withdrawal on his part, *typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals." Id.* at 803-04 (emphasis added); *see also United States v. Heckman,* 479 F.2d 726, 729 (3d Cir.1973). Of course, there is no single way withdrawal can be established; in large part whether a particular action constitutes withdrawal depends on context. Thus, the Supreme Court has cautioned against placing "confining blinders" on the jury's consideration of evidence of withdrawal and has held that "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *United States v. United States Gypsum Co.,* 438 U.S. 422, 464-65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978).

We have divided the standard for showing withdrawal into two stages. First, the defendant must come forward with evidence evincing a prima facie showing of withdrawal. If the defendant makes this prima facie showing, the burden then shifts to the government to rebut the prima facie case, "either by impeaching the defendant's proof or by going forward with evidence of some conduct in furtherance of the conspiracy subsequent to the act of withdrawal." *United States v. Local 560,* 974 F.2d 315, 338 (3d Cir.1992) (citing *Steele,* 685 F.2d at 804).

583   This case poses the question of when retirement or resignation from an enterprise constitutes withdrawal from a conspiracy utilizing that enterprise. We have had a number of occasions to write about such situations, and those cases assist us in articulating *583 a standard. In *United States v. Gillen,* 599 F.2d 541 (3d Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979), the defendant argued that the burden shifted to the government to disprove withdrawal after he established that he "began removing himself [from the enterprise] except for labor negotiations and his efforts to sell the company." *Id.* at 547-48. We disagreed, noting that "[t]he burden is ... on the defendant to prove `(a)ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators.'" *Id.* at 548 (citing *United States Gypsum Co.,* 438 U.S. at 464, 98 S.Ct. at 2887) (first alteration added). In *United States v. Lowell,* 649 F.2d 950, 955-60 (3d Cir.1981), we held that withdrawal was a jury question when the defendant severed his ties to the enterprise yet subsequently committed acts that at least arguably demonstrated post-retirement participation in the conspiracy. In contrast to *Lowell,* the defendant in *Steele* completely severed his ties with the enterprise, and when that evidence went unrebutted by the government, we held that the defendant had established withdrawal as a matter of law. *Steele,* 685 F.2d at 804.

Analysis of these cases leads to the following principles: (1) resignation from the enterprise does not, in and of itself, constitute withdrawal from a conspiracy as a matter of law; (2) total severing of ties with the enterprise may constitute withdrawal from the conspiracy; however (3) even if the defendant completely severs his or her ties with the enterprise, the defendant still may remain a part of the conspiracy if he or she continues to do acts in furtherance of the conspiracy and continues to receive benefits from the conspiracy's operations.

When seen through the lens of a two-stage burden of proof, we believe the cases establish that if the defendant completely severs his or her relationship with the enterprise, he or she has established a prima facie showing of withdrawal from the conspiracy without showing any other affirmative act inconsistent with the conspiracy and without giving any further notice to his or her co-conspirators. Once the defendant makes this showing, the burden shifts to the government either to rebut the defendant's showing or to establish that the defendant continued to participate as a co-conspirator. However, if the defendant has not completely severed his ties with the enterprise, then in order to establish a prima facie case, he must demonstrate either that he gave notice to his co-conspirators that he disavows the purpose of the conspiracy or that he did acts inconsistent with the object of the conspiracy.

This approach is consistent with that taken by other courts of appeal. For instance, the Court of Appeals for the Second Circuit recently concluded that a defendant-attorney had not withdrawn from a conspiracy when, although he resigned from the enterprise law firm, he "`continued to be entitled to a percentage of the recovery on all cases he tried including those giving rise to his pre-[resignation] racketeering acts.'" United States v. Eisen, 974 F.2d 246, 269 (2d Cir.1992) (citation omitted), cert. denied, ___ U.S. ___, 113 S.Ct. 1840, 123 L.Ed.2d 467 (1993). Conversely, in the civil RICO case of Krause v. Perryman, 827 F.2d 346 (8th Cir.1987), the defendant produced uncontradicted and unrebutted evidence that he had "sold all his stock and resigned as president of [the enterprise]" prior to the events that injured the plaintiffs. Id. at 351. The court concluded that he was entitled to summary judgment.

584

Applying these principles to this case, it is clear that Mitchell has not established a prima facie case of withdrawal. While he resigned from Crazy Eddie, he did not sever all his ties with the enterprise. To the contrary, Mitchell concedes that he retained stock in the enterprise until September 16, 1987, a date within the five-year limitations period. Therefore, Mitchell continued to receive the fruits of the fraud.[13] *584 Moreover, Mitchell has produced no evidence that he acted inconsistently with the goals of the conspiracy. While he points out that he participated in an attempt to take over Crazy Eddie, there is nothing to indicate that he would have exposed the fraud. To the contrary, his failure to say anything about the fraud indicates otherwise.[14]

Mitchell argues that by focusing on his retention of stock, he is put in a catch-22 situation: If he sells the stock, he benefits from the conspiracy; if he retains the stock, he has not severed his ties with the enterprise and can be liable for substantive securities fraud. The argument is wrong. If he sells the stock, he may have benefitted from the conspiracy at that particular time, and, depending on whether the elements of the crime are met, may or may not be liable for securities fraud. But from that day forward, his relationship with the enterprise would be severed, and the statute of limitations would run. There is no catch-22.

Because Mitchell did not make out a prima facie case of withdrawal, he was not entitled to have the RICO conspiracy, the section 371 conspiracy, and the substantive fraud counts dismissed as a matter of law on the basis that his resignation from Crazy Eddie constituted withdrawal from the conspiracy.

## CONCLUSION

For the reasons detailed above, we will reverse the convictions and sentences of both Eddie Antar and Mitchell Antar, and we will remand the case for a new trial before a different district judge to be selected by the Chief Judge of the District of New Jersey.

[1] This section is based on evidence adduced at trial, and is intended only for background. The description of wrongful activity is based on the indictment, and the government's allegations and proofs.

[2] Because this appeal involves two brothers — Eddie Antar and Mitchell Antar — we sometimes refer to Eddie Antar simply as "Eddie" and to Mitchell Antar as "Mitchell."

[3] The date of January 21, 1987, appears in the order. The sequence of dates leads us to believe that January 21, 1988, may have been intended.

[4] References to "app." are to the appendix filed by Eddie Antar. References to "JA" are to the appendix filed jointly by the government and Mitchell Antar.

[5] Although Eddie Antar's brief details the argument, Mitchell Antar joined in this portion of Eddie's argument. Therefore, this discussion applies to both appellants.

[6] Although Eddie's counsel mentioned in his brief and at oral argument that the plain error standard of review applies, we have some doubt about that proposition. The recusal argument is premised on a statement the district judge made *after* conviction and during a sentencing hearing. Counsel may well have thought — quite reasonably — that making a recusal motion at that point would be pointless. Of course, Eddie could have moved for a new trial on the basis that the judge should have disqualified himself. At any rate, because the appellants concede the applicability of the plain error doctrine, we will exercise that standard of review.

[7] In *Olano,* the Supreme Court pointed out that Rule 52(b)'s requirement that the error affect substantial rights "in most cases ... means that the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." *Id.* at ___, 113 S.Ct. at 1778. The Court did not decide whether the phrase "is always synonymous with `prejudicial,'" leaving the possibility that "[t]here may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome." *Id.* Since the discussion of prejudice grew out of

the "harmless error" review, it has no bearing here. The touchstone of recusal is the integrity of the judiciary, and therefore once the appearance of partiality is shown, prejudice is presumed.

[8] Michael Chertoff was United States Attorney for the District of New Jersey at the time.

[9] The defense attorney.

[10] Arseneault was Eddie's attorney.

[11] Shivah is a seven-day period of mourning observed after the funeral of a family member or close relative, which is observed in the home.

[12] We must emphasize that we are not drawing a distinction based on whether or not it is possible to complete the act. For instance, under basic conspiracy law, if a defendant conspires *to* operate or manage an enterprise through a pattern of racketeering activity, impossibility is not a defense.

[13] Mitchell argues that because he was acquitted on counts 17 and 18, which charged him with securities fraud based on the stock sales, the stock sales cannot be used against him on deciding the withdrawal issue. Of course, since we have reversed the convictions, they can have no effect on the question before us. More than that, though, our inquiry is whether Mitchell has established withdrawal as a matter of law, which would entitle him to judgments of acquittal on some of the counts in the indictment. For this purpose, the only question is whether Mitchell's retention of stock after his resignation negates the argument that he established a prima facie case of withdrawal. In this regard, it is undisputed that Mitchell sold his stock in September 1987, *see* br. at 42, and this is the fact on which we focus.

[14] Of course, the stock price may have declined. But that is neither here nor there. By retaining the stock, Mitchell did not completely sever his relationship with Crazy Eddie. *Compare* Krause v. Perryman, 827 F.2d 346, 351 (8th Cir.1987) (withdrawal established where defendant resigned as president *and* sold his stock). Therefore, Mitchell *could* have benefited from the unlawful conspiracy had the fraud succeeded.

Save trees - read court opinions online on Google Scholar.